UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
MOHAMMED RAZZAK, MOHAMMAD     :   Docket No. 17 Civ. _____
SIDDIQUE and MOHAMMAD ISLAM, on behalf :
of themselves and others similarly situated,    :
        :
        :   **COMPLAINT**
        Plaintiffs,    :
        :
     v.      :
        :   Jury Trial Demanded by Plaintiffs
JUNO USA, LP, VULCAN CARS LLC, TALMON :
MARCO, and GT FORGE, INC. d/b/a GETT,  :
        :
        Defendants.   :
------------------------------------------------------------- x

Plaintiffs Mohammed Razzak, Mohammad Siddique and Mohammed Islam ("Plaintiffs or "Class Representatives"), by their undersigned attorneys, on behalf of themselves and all others similarly situated, allege, based on personal knowledge as to allegations regarding themselves, and based on information and belief as to other allegations, as follows for their class action complaint against defendants Juno USA, LP, Vulcan Cars LLC, Talmon Marco, and GT FORGE, INC. d/b/a Gett (collectively, "Defendants"):

1.    Plaintiffs bring this civil action seeking monetary damages, restitution, and injunctive relief from defendants, arising out of defendants' unfair, deceptive, and unconscionable actions.  Plaintiffs bring claims on behalf of themselves and all others similarly situated for violation of false advertising law; breach of contract; breach of the implied covenant of good faith and fair dealing; conversion; misrepresentation; and shareholder derivative claims on behalf of themselves and all stakeholders in the mobile taxi company at the center of this dispute defendant Juno USA, LP ("Juno").

2.    Plaintiffs are drivers who for years toiled working as drivers in New York City. They routinely worked 50-60 hour workweeks.  In recent years, they have worked for Uber and

Lyft, as well as fringe competitors to those two market behemoths, including Gett, Via and a host of other startup tech companies hoping to be the next big mobile taxi platform.

3.      Juno was founded several years ago to compete with Uber and Lyft.  It's strategy both simple and brilliant.

4.      It set out to acquire Uber and Lyft's most prized asset—drivers.  Not just any drivers.  Drivers with TLC-licenses.  Drivers with the right insurance to operate as a taxi in New York City.  Drivers who were familiar with the mobile taxi technology and the hurdles one encounters in that job.  Drivers who were already trained by Uber and Lyft and could immediately collect fares and deliver excellent service.  And, in sinister fashion, it set out to acquire drivers who could continue working for Uber and Lyft except promote Juno to Uber and Lyft customers in the process.

5.      To lure the drivers, Juno offered a very appealing carrot.  The promise of equity ownership.  The idea that these elite drivers, coming together, and driving for Juno would result in a viable competitor to Uber and Lyft, a company of incredible value, and a company owned, albeit in part, by the drivers who made it all possible.

6.      Juno derived tremendous value from marketing itself as pro-driver and promising drivers an equity stake.  Drivers joined Juno on the specific promise that if the more they drove for Juno, the more equity they would acquire.  Customers flocked to Juno when they heard, often from the drivers, how Juno was a socially responsible company.  One owned by the drivers itself and not a handful of founders and investors.

7.      What unfolded was the start of modern day startup fairy tale.  Top-rated drivers switched from Uber and Lyft to Juno.  Juno successfully penetrated the hyper-competitive and uber-profitable mobile taxi market in New York City.  In what seemed like overnight, Juno

announced it sold itself for $200 million.  Defendant Talman Marco was riding high, having now sold a second tech company he founded for hundreds of millions, the prior company he founded, Viber having been sold for in excess of $700 million.  Juno's parent company defendant Vulcan Cars LLC and all of Juno's investors were no doubt extremely pleased with their investment. And, Defendant GT Forge Inc. d/b/a Gett ("Gett") must have been pleased with its shiny new $200 million mobile taxi platform and more importantly highly skilled and ready-to-go workforce.

8.      The drivers were not riding high.  They were still driving for Juno.  But they had nothing to show for Juno's success.  To be sure, almost all had acquired shares in the company. Many had opted to to accept $100 in shares of Juno instead of $100 cash as a sign-up bonus when being a top-rated driver who switches from Uber or Lyft to Juno.  But those shares turned out to be worthless.

9.      Juno explained the company would continue but the program of granting drivers equity shares was terminated.  Existing shares were either extinguished for no value, or extinguished in exchange for *de minimis* cash consideration—an amount representing a fraction of what they were owed had Juno honored its agreements.

10.     The drivers were understandably outraged.  As a whole, they were a small group of drivers recruited from among the top ranks of Uber and Lyft's driver pool.  In closed door meetings with Juno they were told that they were being offered the opportunity to get equity in a growing startup with plans to defeat Uber and Lyft.  Plaintiffs (and presumably the other Juno drivers) were hesitant to invest the time and effort of learning a new mobile taxi platform. Plaintiffs were alarmed that Juno suggested they continue working for Uber and Lyft and promote Juno to Uber and Lyft's customers.  But Juno was very persuasive.  Juno explained that

the drivers were a key part of Juno's strategy and Juno would reward them handsomely with an equity stake.  All the drivers had to do was meet the screening requirements; advertise Juno to Uber and Lyft customers; and then for each month where they worked for 120 hours in the service of Juno, they would be awarded a certain percentage of equity in the company.  Juno even went so far as to promise that equity would be treated the same in terms of dilution and distribution rights in the event Juno was ever sold of conducted an initial public offering.

11.     Juno made it all up.  A series of blatant falsehoods in the chase of a hundred million dollar buyout offer.  Mr. Marco did not found and build a pro-driver company where everybody owns a share.  Once Juno, Mr. Marco and the investors had a $200 million offer in sight, they swiftly and resolutely turned their back on Driving Partners.

12.     What started as a startup fairy tale was a veritable startup nightmare.  Windfall profits and complete disregard for the rights of an entire class of hard working NYC drivers.  Drivers who though duped, continue to toil away collecting fares on a mélange of mobile taxi platforms to make a living.

13.     Defendants' actions give rise to causes of action sounding in breach of contract, false advertising under state and federal law, and intentional misrepresentation.  In addition to those claims, Plaintiffs bring several other claims against Juno and various of the defendants.

14.     Plaintiffs bring a claim for conversion based on Juno, in violation of its agreement with its drivers, taking a larger commission than it was entitled to on each fare earned by the driver.

15.     Plaintiff Mohammed Razzak brings claims on behalf of himself and others similarly situated sounding in breach of contract, false advertising, and intentional misrepresentation based on Juno's false and deceptive statements made in connection with

Juno's promotional offer to first-time drivers with Juno.  Specifically, Juno informed Mr.
Razzak, and a proposed class of similarly situated drivers, that upon being approved as a Juno
driver, Mr. Razzak had the option of receiving either $100 in cash, or an equity stake in Juno
worth $100.  It was also explained to Mr. Razzak and the proposed class that if they drove for
Juno for at least 120 hours per month, they would earn additional equity in Juno and the value of
their equity stake would consistently rise, and that in the event of a sale or IPO, the equity stake
would be valued equally and in proportion to all other equity stakeholders.

16.     Plaintiff Mohammad Islam brings claims on behalf of himself and others similarly
situated sounding in breach of contract, false advertising, and intentional misrepresentation
concerning Juno's driver referral program.  Juno asked Mr. Islam to provide the contact
information for any drivers Mr. Islam thought fit to drive for Juno.  Juno promised that if any of
those drivers drove for Juno, Mr. Islam would receive between .5 and 2% of that driver's total
fares.  Mr. Islam referred several drivers in this manner but Juno never fulfilled its promise to
remit a percentage of those drivers' total fares to Mr. Islam.

17.     Plaintiffs bring a shareholder derivative claim against Juno and its CEO, Talmon
Marco, on behalf of all shareholders as said defendants breached their fiduciary duty to their
shareholders, were grossly negligent in orchestrating their sale to Gett, mismanaged the shares
program and sale to Gett, and committed other serious acts and omissions which damaged the
value of the company and made it vulnerable to civil and criminal legal action.

18.     Plaintiffs also bring a securities fraud claim on behalf of themselves and others
similarly situated as the defendants unlawfully designed, implemented and offered the RSU
program without SEC approval, failed to give appropriate notifications to the putative class

members, and then cancelled said program upon being acquired by Gett without adequate compensation to the putative class members.

## THE PARTIES

19.     Plaintiff Mohammed Razzak is a citizen of the United States, residing in Bronx County, New York.

20.     Plaintiff Mohammad Siddique is a citizen of the United States, residing in Queens County, New York.

21.     Plaintiff Mohammed Islam is a citizen of the United States, residing in Queens County, New York.

22.     Defendant Juno USA, LP is a Delaware limited partnership transacting business in the State of New York.

23.     Defendant Vulcan Cars LLC is a Delaware limited liability company transacting business in the State of New York.

24.     Defendant Talman Marco, an individual, is the Chief Executive Officer of Juno and, upon information and belief, is either a resident of or does business in New York.

25.     Defendant GT Forge Inc., d/b/a/ Gett is a Delaware corporation transacting business in the State of New York.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 1332.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

27.     This Court has personal jurisdiction over all defendants because they conduct substantial business within New York, such that Defendant has significant, continuous and pervasive contracts with the State of New York.

- 6 -

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants do business throughout this district, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial district.

### FACTS COMMON TO ALL COUNTS

29.     Defendant Juno USA, LP ("Juno") started operation in or around 2015.

30.     Juno's primary competitors were Uber and Lyft.

31.     Juno also competed with a number of other companies offering ridesharing services in New York, including GT Forge Inc. d/b/a/ Gett ("Gett").  Gett and these other companies were smaller companies of various sizes, each seeking to compete in and capture a share of the market dominated by Uber and Lyft.

32.     For all these companies, including Juno, competing with Uber and Lyft was an expensive proposition, but one that could pay off big time.  Just a few years after entering the New York City mobile taxi market, the value of Uber and Lyft's operations in New York was astronomical, totaling in the hundreds of millions, if not billions of dollars.  Needless to say, it would have been a profitable endeavor for a startup business to compete with and capture a share of the market enjoyed by Uber and Lyft.

33.     Moreover, the market for investment capital at the time Juno entered the New York City ridesharing market was such that, if a company like Juno could prove a viable competitor to Uber and Lyft, that company would be extremely attractive to investors and a prime target to be taken public or acquired by a third party, resulting in a windfall of profits to Juno owners.

34.     When Juno launched in or around February 2016, it billed itself a "pro-driver" rideshare company, in comparison to Uber and Lyft which Juno cast as unfair and unequitable to drivers.

35.     Much if not all Juno marketing efforts referenced the fact that Juno's "Driving Partners" (i.e., the plaintiff drivers) had an ownership interest in Juno.  On several occasions from its inception to the date it was bought by Gett, Juno promoted and advertised that its drivers were owners in the company and that it would distribute equity to all its drivers, with equal distributions being made until the year 2026, at which point 50% of the Company shall have been distributed to drivers.  Juno's marketing efforts also included repeated references that it was "socially responsible," that it operates in a way that granted drivers a real chance to share in the profits of the the company.  The idea behind Juno's marketing strategy was to attract drivers and customers away from Uber and Lyft.

36.     In addition to claiming to be pro-driver, Juno billed itself as having the best drivers.  Juno touted that all of its drivers had driven for Uber or Lyft and had achieved a rating on those companies' internal rating system putting them in the very top percentile of all drivers. Drivers with similar ratings were rare and not easy to come by.

37.     As a result of Plaintiffs being Uber or Lyft drivers with high "star" ratings, they were desirable to Juno and so were offered an attractive compensation package to switch from Uber to Juno – one that involved a better payout structure, including an up-front payment that served as a "signing bonus" (i.e., signing with the new company) or "transfer bonus" (for leaving Uber), lower commissions deducted from their fares, and profit sharing.

38.     Juno's representations and advertisements set forth above were the key determining factors in Plaintiffs' decisions to transition to Juno full time.

39.     As for consumers, Juno understood that consumers picking between Juno, Uber, Lyft, or another ridesharing company, give substantial consideration to which company compensates its drivers the best.  Juno's claim as the only company where riders actually have an ownership stake was a significant marketing advantage.

40.     For a brief period of time, Plaintiffs were rewarded with their investment in transitioning to Juno and meeting Juno's hourly requirement of 120 hours per month in order to earn equity.

41.     Month after month, Plaintiffs worked the required 120 hours and their Juno "Driver App" would notify them of the amount of additional shares they had acquired.

42.     The ruse wore off in April 2017.  Juno announced that it was selling itself to Gett for $200 million.  As part of the announcement, Juno announced that drivers who had received shares in the Company would either: have those shared extinguished with no compensation, or receive an amount per share to be determined based on each driver, with each share not being valued the same, and being valued by Juno with no disclosure of the method of valuation.

43.     Plaintiffs were victims of the classic "bait and switch" scheme – promised equity and then paid off at pennies on the dollar when all other shareholders/investors made out handsomely.

44.     It became immediately clear that Juno's promises and statements were false. It is evident that Juno had undertaken a business plan aimed at luring Uber and Lyft's best drivers based on false representations, using those drivers to achieve market penetration, and sell the company for as soon as an attractive offer came around.  It was not pro-driver.  It was not the socially responsible rideshare company it tried so hard to position itself as.  And, most importantly—it did not make drivers equity partners who would share proportionately in the

profits of the company if there was ever a buyout.  Drivers didn't get what they bargained for. And, consumers were never transacting with a company that operated the socially responsible way or afforded its drivers ownership interests.

45.     Upon information and belief, for those Juno Driving Partners who were offered compensation for their shares, different amounts per share were offered to different drivers, and no driver was offered an amount equivalent to the amount investors and other owners of Juno received for each share as part of the Gett Transaction.

46.     By the time it became clear that Juno's marketing campaign was replete with falsehoods and deliberate misrepresentations of fact aimed at luring drivers and consumers to switch from Uber and Lyft to Juno, Juno had accomplished what it set out to do – earn a significant share of the New York rideshare market, prove its service was a viable competitor to Uber and Lyft, and, turn a modest capital investment in technology and a deceptive and sinister marketing campaign, into a $200 million all cash buyout from a bigger rival company.

47.     Some drivers, including Mr. Razzak were also misled into believing that they had received a valuable signup bonus when first switching to Juno.  Juno offered Mr. Razzak and thousands of other Uber and Lyft drivers situated similarly to him, with the option of a $100 signing bonus for switching to Juno from Uber, or $100 worth of equity.

48.     Plaintiff Razzak chose to take the $100 in equity. Juno called these "Restricted Stock Units" (RSUs) in documents Mr. Razzak was shown concerning the promotion.  In contexts other than the promotion, Juno referred to RSUs as shares or Driving Partners Equity.

49.     Juno never informed Plaintiffs and putative class members what the par value was of each RSU set aside by Juno for the drivers, how the RSUs would be calculated and distributed

to drivers, what criteria was used to award RSUs to drivers, the date and/or conditions upon
which the RSUs would vest, and the fair market value assigned to the RSUs when they vested.

50.     Juno never provided Plaintiffs and putative class members with regular reports
stating their RSUs earned and/or pending nor the price per share.

51.     Juno never provided Plaintiffs and putative class members with the ability and/or
opportunity to sell their vested RSUs.

52.     Juno's purported offering of equity to Plaintiff and putative class members was a
farce designed to lure highly rated drivers from Uber and Lyft to Juno.

53.     In anticipation of and upon Juno's acquisition by Gett, the defendants
purposefully diluted the value of Plaintiffs and putative class members' RSUs.

54.     Juno announced it had been acquired by Gett for $200 million.

55.     After the announcement, in a notice to drivers, Juno addressed the RSUs.

56.     Juno stated, "Effective immediately, the Juno RSU program is officially
terminated and a new cash incentive plan will be introduced."

57.     As to existing shares, Juno said "it decided to make payments to drivers in
connection with the termination of the Juno RSU program to reflect each driver's contribution to
Juno."

58.     Juno further indicated that drivers with shares who sign up for the new cash
incentive plan to be introduced by the new company, "will be eligible to receive cash bonuses
according to the terms of the new plan."

59.     Mr. Islam received $226 for his 12,756 RSUs ($.0177171/share).

60.     Mr. Razzak received $130 for his 7,350 RSUs ($.017687/share).

61.     Mr. Siddique has not been provided a valuation of his shares or any payment.

62.     Mr. Islam has not enrolled in the new cash incentive plan.  Mr. Razzak also has not enrolled.  Same for Mr. Siddique.

63.     Buried in the notice to drivers was a bombshell revelation.

64.     At some point prior to Juno and Gett discussing a transaction, the SEC discussed with Juno that the SEC deemed it necessary to change how Juno implemented its RSU program.

65.     Among the representations Juno made to drivers was in a series of mobile alerts displayed in the Juno app.

66.     One such alert advised:

*Juno Restricted Stock Units (RSUs)*

*When Juno was created, half of the founding shares were reserved for drivers.  Every three months, we allocate 25,000,000 Juno Restricted Stock Units (RSUs) to drivers. Each RSU may become one Juno common stock if certain conditions are met in the future.  These include meeting minimum service requirements and the occurrence of an IPO or acquisition of Juno within 7 years of the draft date.*

*The more you drive, the more RSUs you earn.*

67.     Juno never advised its drivers, *inter alia*, how the RSUs would be allocated to each driver, how drivers would earn RSUs, and at what rate drivers would accumulate RSUs.

## CLASS REPRESENTATION ALLEGATIONS

68.     <u>Ascertainable class</u>: The proposed Class is ascertainable in that its members can be identified and located using information contained in Defendants' records kept in the ordinary course of their business, specifically payroll, personnel, and shareholder records.

69.     Plaintiffs seek to represent a class defined as all persons in the United States who worked for Juno.

70.     At this time, Plaintiffs also seek to represent three subclasses.

71.     The first subclass, to be called the RSU Subclass is to be composed of all Class members who worked as Juno drivers and received RSUs.

72.     The second subclass, to be called the $100 Promotion Subclass is to be composed of all Class members who chose to receive $100 worth of RSUs in lieu of $100 in cash as part of the promotion offer made by Juno to new drivers.

73.     The third subclass is to be composed of all Class members who referred a driver to Juno, and that driver went on to work for Juno with Juno failing to compensate the class member with the agreed upon percentage of the driver's fares.

74.     Numerosity: The potential number of members of the Class and Subclasses is so numerous that their individual joinder herein is unfeasible and impracticable.  On information and belief, members of the Class and Subclasses number in the thousands. The precise number of Class and Subclass members and their identities are unknown to Plaintiffs at this time but are believed to be in excess of 20,000 members. The disposition of their claims through this class action will benefit both the parties and the Court. Class and Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

75.     Typicality: The claims and damages of the named Plaintiffs are typical of the claims and damages of the Class and Subclasses. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to (a) whether Defendants' labeling, marketing and promotion of Juno's offer to drivers, including offers to grant RSUs and the $100 promotional offer, is false and misleading, (b) whether Defendants' valuation of the

RSUs when purchased back from the drivers was reasonable and equitable, and (c) whether Juno was miscalculating its commission and, therefore, underpaying the drivers. Adequacy: Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

76.     Superiority: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Subclass members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Furthermore, the claims of the individual members of the Class may not be sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses thereto. As the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or even impossible for individual member of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### (False Advertising, 15 U.S.C. §§ 41 - 56)

77.     Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

78.     Plaintiffs bring this Count I individually and on behalf of the Proposed Class.

79.     Based on the foregoing, Defendants engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of federal false advertising statutes.

80.     Defendants' false, misleading and deceptive statements and representations of fact consisted of statements appearing on Juno's website, in written materials given to and viewed by the plaintiffs and putative class members, and in oral statements to the plaintiffs and putative class members.  These statements included but were not limited to that drivers would earn Juno equity shares, redeemable in the event of a sale or IPO, and subject to equal treatment as the founders' shares in terms of dilution, when switching from Uber or Lyft to Juno and either (a) working at least 120 hours per month for Juno or (b) accepting Juno's sign-up bonus of $100 in RSUs ("Misrepresentations").

81.     Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were directed to the plaintiffs and putative class members.  Further, they were and are advertising in connection with the furnishing of services with an effect on interstate commerce.

82.    Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were likely to mislead a reasonable driver acting reasonably under the circumstances.

83.    Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, resulted in the drivers' financial injury and/or has harmed the public interest.

84.    As a result of Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, Plaintiffs and putative class members have suffered and continue to suffer economic injury.

85.    Plaintiffs and the Proposed Class suffered an ascertainable loss caused by Defendants' misrepresentations when they: chose to receive $100 in RSUs instead of cash; chose to spend time interviewing and training to become Juno drivers at the expense of spending that time driving and earning money as Uber drivers; ended up earning less money working for Juno in comparison to their time previously at Uber; and suffered embarrassment and damage to their reputation as they were the face of Juno and always espoused how great Juno's profit sharing plan was for the drivers.

86.    By virtue of the conduct alleged in the paragraphs above, Plaintiffs have shown Defendants repeatedly and persistently engaged in false advertising, in violation of federal false advertising laws.

87.    On behalf of themselves and other members of the Proposed Class, Plaintiffs seek to: enjoin the unlawful acts and practices described herein; to recover their actual damages or five hundred dollars, whichever is greater; to recover statutory treble damages; and to recover statutory attorneys' fees and costs.

## COUNT II

### (False Advertising, New York Gen. Bus. Law § 349 and 350)

88.     Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

89.     Plaintiffs bring this Count II individually and on behalf of the Proposed Class.

90.     Gen. Bus. Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

91.     Gen. Bus. Law § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

92.     Based on the foregoing, Defendants engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

93.     Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were directed to the plaintiffs and putative class members.  Further, they were and are advertising in connection with the furnishing of services in the State of New York.

94.     Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were likely to mislead a reasonable driver acting reasonably under the circumstances.

95.     Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, resulted in the drivers' financial injury and/or has harmed the public interest.

- 17 -

96.     As a result of Defendants' false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, Plaintiffs and putative class members have suffered and continue to suffer economic injury.

97.     Plaintiffs and the Proposed Class suffered an ascertainable loss caused by Defendants' misrepresentations when they: chose to receive $100 in RSUs instead of cash; chose to spend time interviewing and training to become Juno drivers at the expense of spending that time driving and earning money as Uber drivers; ended up earning less money working for Juno in comparison to their time previously at Uber; and suffered embarrassment and damage to their reputation as they were the face of Juno and always espoused how great Juno's profit sharing plan was for the drivers.

98.     By virtue of the conduct alleged in the paragraphs above, Plaintiffs have shown Defendants repeatedly and persistently engaged in deceptive acts/practices and false advertising, in violation of Gen. Bus. Law §§349 and 350.

99.     On behalf of themselves and other members of the Proposed Class, Plaintiffs seek to: enjoin the unlawful acts and practices described herein; to recover their actual damages or five hundred dollars, whichever is greater; to recover statutory treble damages; and to recover statutory attorneys' fees and costs.

## COUNT III

### (Breach of Contract – Commission Fee)

100.     Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

101.     Plaintiffs bring this Count III on behalf of themselves and putative class members against all Defendants.

102.     Juno agreed to remit to Plaintiffs and putative class members (a) the Fare less Juno's commission, (b) the tolls, and (c) depending on the region certain added taxes and ancillary fees, which in New York City includes the Black Car Fund.

103.     Juno did not remit to Plaintiffs and putative class members all the applicable taxes and ancillary fees, including state and local sales tax and other ancillary fees.

104.     Juno improperly calculated its commission based upon the net fare, which it deemed included taxes and ancillary fees (e.g., Black Car Fund), causing Plaintiffs and putative class members to bear a larger percentage of such amounts even though they should not bear any part of such charges as set forth in Juno's agreement with drivers and applicable law and regulation.

105.     As a result, Juno's commission was inflated beyond the amount set forth in the applicable agreements, to financial detriment and pecuniary loss of Plaintiffs and putative class members.

106.     Juno's improper calculation of its commission based upon the Fare less tolls but including taxes and ancillary fees (e.g., sales tax and Black Car Fund) resulted in Juno taking an inflated commission from Plaintiffs and putative class members, which constitutes a breach of contract.

107.     Juno also failed to reimburse Plaintiffs and putative class members the taxes and ancillary fees (e.g., sales tax and Black Car Fund) collected from Riders, as set forth in the Plaintiffs and putative class members' agreement with Juno.

108.     As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld and improperly calculated by Defendants to the detriment of Plaintiffs and putative class members.

## COUNT IV

### (Breach of Covenant of Good Faith and Fair Dealing)

109.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

110.    Plaintiffs bring this Count IV on behalf of themselves and putative class members against all Defendants.

111.    As described above, Plaintiffs and putative class members entered into contracts with Juno.

112.    Plaintiffs and putative class members performed all, or substantially all, of their responsibilities under the contracts.

113.    Implied into every contract is a covenant of good faith and fair dealing that requires the parties to act in good faith in their dealings with each other. This is especially true of the party that is in a stronger position and has the ability to exercise discretion. That discretion is required to be exercised in good faith.

114.    Juno violated the implied covenant of good faith and fair dealing toward Plaintiffs and putative class members by engaging in the misleading and deceptive acts and practices described above, and thus, deprived Plaintiffs and putative class members of the benefit of their bargain.

115.    As a consequence of the foregoing, Juno is liable to Plaintiffs and putative class members in an amount to be determined at trial.

## COUNT V

### (Misrepresentation and Fraud)

116.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

117.    Plaintiffs bring this Count V on behalf of themselves and putative class members against all Defendants.

118.    Juno purposefully misrepresented the terms and conditions of its RSU program to the plaintiffs and the putative class members for the purpose of inducing them to leave Uber and Lyft and join Juno.

119.    Juno purposefully omitted material terms and conditions of its RSU program from plaintiffs and the putative class members for the purpose of inducing them to leave Uber and Lyft and join Juno.

120.    Juno made these misrepresentations and omissions in an effort to lure highly rated Uber and Lyft drivers to join Juno, knowing that these drivers were publicly unhappy with Uber and Lyft's treatment and compensation of them.

121.    Juno had no intention of ever providing the plaintiffs and putative class members with a 50% stake in Juno, as it advertised and claimed.

122.    Juno had no intention of ever allowing the plaintiffs and the putative class members' RSUs to vest.

123.    Juno had no intention of ever offering the plaintiffs and the putative class members fair market value for their RSUs.

124.    In furtherance of this scheme and/or fraud, Juno did not send RSU plan documents to its drivers.

125.    In furtherance of this scheme and/or fraud, Juno did not send RSU transaction documents to its drivers.

126.    In furtherance of this scheme and/or fraud, Juno continued to advertise, promote, and attract Uber and Lyft drivers to join its service, accumulating approximately 12,000 drivers

in New York City alone, despite knowing that it would be unlawful to compensate its drivers with equity in the company and/or distribute RSUs to its drivers.

127.    Upon information and belief, Juno's equity compensation program violated state and federal securities laws, rules and regulations, including but not limited to:

   a.   Section 5 of the Securities Act of 1933 *et seq.* (Securities Act) as Juno failed to register same with the SEC or seek an exemption;

   b.   Sections 12(g) and 12h-1(f) of the Securities Exchange Act of 1934 (Exchange Act) as Juno failed to register same under the Exchange Act; and

   c.   New York's blue sky laws as Juno failed to register or qualify same with the state.

128.    The plaintiffs and putative class members relied upon Juno's misrepresentations of the RSU program by leaving Uber, Lyft, and other employment in order to join Juno and work for *inter alia* an equity stake in the company.

129.    As a result of the defendants' misrepresentations and fraudulent conduct, the plaintiffs and the putative class members suffered pecuniary losses.

## <u>COUNT VI</u>

### (Securities Fraud)

130.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

131.    Plaintiffs bring this Count VI on behalf of themselves and putative class members against all Defendants.

132.    Plaintiffs and putative class members were victims of a securities fraud perpetrated by the defendants.

133.    Juno never informed and/or provided Plaintiffs and putative class members with any specific information regarding the RSU program (e.g., what the par value was of each RSU set aside by Juno for the drivers, how the RSUs would be calculated and distributed to drivers, what criteria was used to award RSUs to drivers, the date and/or conditions upon which the RSUs would vest, the fair market value assigned to the RSUs when they vested, whether the drivers would have voting rights, whether a driver would forfeit his/her RSU's if he did not drive for Juno within/after a certain period of time, what would happen to a driver's accumulated RSUs if he/she stopped driving for Juno, what would happen to a driver's accumulated RSUs in the event he/she became disabled and could not drive for Juno for a period of time, etc.).

134.    Juno never provided Plaintiffs and putative class members with regular reports stating the RSUs earned and/or pending nor the price per share.

135.    Juno failed to report to the value of the RSU program, each RSU, and each driver's RSU portfolio to investors, corporate auditors, government officials, and the drivers themselves.

136.    Juno failed to report to the value of the RSU program, each RSU, and each driver's RSU portfolio in the company's financial reports.

137.    Juno never provided Plaintiffs and putative class members with the ability and/or opportunity to sell their vested RSUs.

138.    Juno's purported offering of equity to Plaintiffs and putative class members was a farce designed to lure highly rated drivers from Uber and Lyft to Juno.

139.    Defendants used deceptive practices to induce Plaintiffs and putative class members to leave Uber and Lyft and join Juno based upon false information regarding Juno's RSU program.

140.    Juno sought to and did capitalize upon their unsophisticated drivers, who believed that they were truly becoming "partners" in Juno and, collectively, would own 50% of the company.

141.    In anticipation of and upon Juno's acquisition by Gett, the defendants purposefully diluted the value of Plaintiffs and putative class members' RSUs and then offered them a fraction of what each RSU was worth.

142.    In anticipation of Juno's acquisition by Gett, the defendants conspired to manipulate the fair market value of Plaintiffs and putative class members' RSUs.

143.    As Gett acquired Juno for approximately $200M in April 2017, each plaintiff and putative class member would be entitled to their proportionate share of half that amount as Juno had previously committed a 50% stake in the company to the RSU program.

144.    According to media reports, including but not limited to *Bloomberg*, drivers received "cash payouts ranged from $100 for a part-time driver to $251 for someone who regularly spent more than 50 hours on the road per week over the last six months. Even if Juno had given $250 to every driver who was active as of February [2017], that would amount to about 1.5 percent of the company's valuation from the sale."

145.    Additionally, on or about August 10, 2016, Juno's RSU program offered Plaintiffs and putative class members the choice between $100 cash or $100 worth of RSUs, valued at 20 cents per share: "New Juno drivers can choose between a sign-up bonus of $100 cash or 500 RSUs ($0.20 per 1 RSU) after taking their first 5 rides." However, upon Gett's acquisition of Juno just eight (8) months later, the RSU program was discontinued and some Plaintiffs and putative class members were paid 1.7 cents per RSU. Others were told they were not eligible for any compensation for their RSUs.

146.     Upon a putative class member no longer driving for Juno, whether voluntarily, or due to dismissal by Juno or disability or other reason, the driver's accumulated RSUs were impermissibly extinguished by Juno.

147.     To the extent a putative class member no longer drove for Juno at the time it was acquired by Gett, whether voluntarily, or due to dismissal by Juno, or due to disability, the driver did not receive any compensation for his/her RSU.

148.     Plaintiffs and putative class members were not offered any equity in Gett following its acquisition of Juno.

149.     As a result of the defendants' misrepresentations and fraudulent conduct, the plaintiffs and the putative class members suffered pecuniary losses.

## COUNT VII

### (Shareholder Derivative Claim)

150.     Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

151.     Plaintiffs bring this Count VII as shareholders of Juno.

152.     Defendants Juno and Talmon Marco, CEO of Juno, must account to the plaintiffs and putative class members for all sums of money and for all benefits received by them and/or their nominees at the expense of the plaintiffs and putative class members, by way of profit or dividend or in any other manner whatsoever with respect Gett's acquisition of Juno and the discontinuation of the RSU program.

153.     Upon information and belief, defendants Juno and Talmon Marco's misconduct, mismanagement and misappropriation of the RSU program harmed the plaintiffs and putative class members.

154.    Defendants Juno and Marco breached their fiduciary duty to the plaintiffs and putative class members.

155.    Defendants Juno and Marco engaged in fraudulent and/or other unlawful activity directed at the plaintiffs and putative class members.

156.    Defendants Juno and Marco acted in self-dealing and greed and at the expense of the plaintiffs and putative class members.

157.    Defendants Juno and Marco failed to truthfully and faithfully account the interests of the plaintiffs and putative class members in financial documents submitted to investors, corporate auditors, government officials, and the drivers.

158.    Defendants Juno and Marco failed to truthfully and faithfully account the interests of the RSU program in financial documents submitted to investors, corporate auditors, government officials, and the drivers.

159.    Defendants Juno and Marco's conduct in organizing, offering, implementing, and administering the RSU program led to and/or could have led to an investigation and enforcement action by the SEC.

160.    The offering, implementing, and administering of the RSU program was unlawful.

161.    Defendants Juno and Marco's management and decisions regarding the RSU program exposed Juno risk, including but not limited to criminal liability and damages, civil liability and damages, and violations of consumer protection and securities laws.

162.    The defendants have failed to redress the plaintiffs and putative class members' claims regarding the valuation of their RSUs.

## COUNT VIII

### (Conversion – Commission Fee)

163.    Plaintiffs repeat the allegations in the foregoing paragraphs as if fully set forth herein.

164.    Plaintiffs bring this Count VIII on behalf of themselves and putative class members against all Defendants.

165.    As set forth above, Juno unlawfully converted and withheld monies due to the Plaintiffs and the putative class members by miscalculating its commission fee.

166.    As set forth above, Juno unlawfully converted and withheld monies due to the Plaintiffs and the putative class members by failing to reimburse Plaintiffs and the putative class members for taxes and ancillary fees (e.g., sales tax and Black Car Fund) collected from Riders.

167.    As set forth above, Defendants unlawfully converted and withheld fair market value of the Plaintiffs and putative class members' RSUs from them.

168.    As set forth above, Defendants unlawfully withheld funds due to the Plaintiffs and the putative class members in the cancellation of the RSU program.

169.    Plaintiffs and the putative class members never permitted Defendants to withhold any monies that were intended to be remitted to them.

170.    As a result of the foregoing, Plaintiffs and the putative class members have been damaged and are entitled to restitution for any and all monies improperly withheld by Defendants.

171.    As a consequence of Defendants' aforementioned withholdings, Plaintiffs are entitled to treble damages.

**RELIEF DEMANDED**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.      For an order certifying the Proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the class members;

b.      For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiffs and the Proposed Class;

d.      For compensatory and punitive damages m amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may deem proper; and

h.      For an order awarding Plaintiffs and the Proposed Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: New York, New York
       June 9, 2017

                          Respectfully Submitted,


                          **LAW OFFICE OF MOHAMMED GANGAT**
                          27005 79 Avenue
                          New Hyde Park, NY 11040-1546
                          Telephone:  (646) 556-6112
                          Facsimile:  (646) 556-6113

Email:  mgangat@gangatllc.com

By:   _____/s/_____
        Mohammed Gangat, Esq. (MG3919)


**HELD & HINES, LLP**
370 Lexington Avenue, Suite 800
New York, New York 10017
Telephone: (212) 696-4529
Facsimile:  (646) 590-4295
Email:  phines@heldhines.com


By:   _____/s/_____
        Philip M. Hines, Esq. (PH5954)

*Attorneys for Plaintiffs and Putative Class Members*